### NASHVILLE, C. & ST. L. RY. CO. v. GILLIAM et al. (7 Div. 507.)

(Supreme Court of Alabama. Nov. 6, 1924.)

**1. Carriers ⊜35—No estoppel from collecting undercharge on interstate shipment.**

Carrier of interstate shipment, under Interstate Commerce Act (U. S. Comp. St. § 8563 et seq.), cannot estop itself from collecting undercharge of freight rates.

**2. Carriers ⊜35 — Undercharge on interstate shipment collectible, though agent made mistake and lien lost by delivery of goods.**

Carrier of interstate shipment may collect undercharge, though agent made mistake as to amount due, and lien was lost by delivery of freight on payment of less than legal rate.

**3. Carriers ⊜35—Consignee receiving goods in interstate shipment held liable for undercharge, notwithstanding agreement with shipper or conduct of railroad.**

Under Interstate Commerce Act (U. S. Comp. St. § 8563 et seq.) fixing freight charges, defendants, named as ones to be notified, in bill of lading, naming shipper both as consignor and consignee, who paid freight and received shipment, became in law the consignees and owners, and were liable to railroad for undercharge of freight, and no agreement with shipper nor estoppel by conduct of railroad could relieve them.

Appeal from Circuit Court, Etowah County; Woodson J. Martin, Judge.

Action to recover undercharge by the Nashville, Chattanooga & St. Louis Railway Company against T. B. Gilliam and T. G. Jordan, doing business as Gilliam & Jordan. Judgment for defendants, and plaintiff appeals. Transferred from Court of Appeals, under Acts 1911, p. 449, § 6. Reversed and rendered.

Goodhue & Lusk, of Gadsden, for appellant.

It is unlawful for a carrier to accept less than the tariff rate for the interstate transportation of goods, and the consignee who obtains the goods upon payment of less, due to misunderstanding, must be deemed to have assumed the obligation of paying the full lawful rate, and is liable to the carrier accordingly. Pittsburgh, etc., Ry. v. Fink, 250 U. S. 577, 40 S. Ct. 27, 63 L. Ed. 1151; West. Ry. v. Collins, 201 Ala. 455, 78 So. 833; Cornelius Co. v. C. of Ga., 13 Ala. App. 533, 69 So. 331; W. & A. Ry. v. Underwood (D. C.) 281 F. 891; L. & N. v. Rice, 247 U. S. 201, 38 S. Ct. 429, 62 L. Ed. 1071; Y. & M. V. v. Zemurray, 238 F. 789, 151 C. C. A. 639. A carrier cannot, by accepting a lower rate, estop itself from demanding the full lawful rate for an interstate shipment. West. Ry. v. Collins, supra.

Disque & Disque, of Gadsden, for appellees.

The propositions raised by appellant are fully answered in C. of Ga. v. Sou. Ferro Concrete Co., 193 Ala. 108, 68 So. 981, Ann. Cas. 1916E, 376; C., N. O. & T. P. v. Vredenburgh, 13 Ala. App. 442, 69 So. 228.

GARDNER, J. The appellant railway company, plaintiff in the court below, sued appellees to recover $237 as an undercharge on an interstate shipment of freight, together with $7.11 war tax thereon, and with interest from September 8, 1920. The cause was tried before the court without a jury upon an agreed statement of facts, the salient features of which will be here stated. The trial resulted in a judgment for the defendants, from which the plaintiff railway company has prosecuted this appeal.

The defendants had purchased through a brokerage firm a carload of shorts at a stipulated price of $69 per ton, delivered to defendants f. o. b. Gadsden, Ala., terms "arrival draft." The car of shorts was shipped to Gadsden under a bill of lading, wherein Nellis-Witter Grain & Milling Company was named both as consignee and consignor, order "notify Gilliam & Jordan, at Gadsden, Ala.," and containing the usual provision that the owner or consignee shall pay the freight. This bill of lading, duly indorsed, was attached to a draft on defendants for the amount of the purchase price, forwarded to the bank at Gadsden, where the defendants paid the amount thereof and received the bill of lading, which was surrendered to the railway company upon delivery of the carload of shorts, defendants paying to the railroad company the sum of $80, the amount demanded as due freight. Subsequently it was discovered the railway company had incorrectly estimated the amount of freight due, and that there remained an undercharge of $237, plus war tax, and demanded of defendants the amount of this undercharge. Defendants refused to pay, stating they had merely paid the freight as a convenience to the shipper, as they purchased the goods delivered in Gadsden, and referred the railway company to the shipper and broker, both being solvent. The railway company did call upon the shipper and broker, but without result, and it further appears that defendants, acting under the belief that the broker had

paid this undercharge, had refunded the same to them.

[1, 2] This was an interstate shipment, and—

"under the Interstate Commerce Act, the freight rate of an interstate shipment is not that named in the bill of lading or contract of shipment, but the lawful rate existing at the time, whether or not such rate is known to the consignor or consignee, and regardless of whether the parties were misled by the carrier as to the lawful rate, or whether it had posted the lawful rate as required by the statute; hence the carrier cannot, by any act, estop itself from demanding the lawful rate. * * * A carrier may recover the legal rate due it on an interstate shipment, although an agent may make a mistake as to the amount due under the legal rate, and through such mistake deliver the freight to the consignee upon the payment of a less sum than the legal rate. * * * The liability of a consignee for freight charges is not affected by the carrier's waiving or losing its lien on the goods by delivery without first collecting the freight." Western Ry. of Ala. v. Collins, 201 Ala. 455, 78 So. 833.

[3] The shipment in the Collins Case, supra, was analogous to that here under consideration; the suit, however, being the converse of that here presented. There the railway company sued the shipper for the undercharge. The shipper was both the consignor and consignee, under a bill of lading known as "an order notify bill," providing that Scott, the purchaser of the goods, should be notified. Scott, the purchaser, paid the draft, obtained the bill of lading, and the shipment was delivered to him by the agent, upon the payment of the freight then demanded, which, however, was an undercharge. The bill of lading also provided that the owner or the consignee should pay the freight. It was there held that when Scott, the purchaser, was notified, and he paid the draft and received the bill of lading, he was in law the consignee and owner of the goods shipped. It was further held that, the railroad company having chosen to collect a part of the freight from Scott, the purchaser, it must collect from him the entire amount, and that the right of action against the shipper must fail. We are persuaded that what was said in the Collins Case is decisive of the question here presented, and that the holding is in line with the federal authorities, which must control in cases of this character.

The case of Pittsburg Ry. Co. v. Fink, 250 U. S. 577, 40 S. Ct. 27, 63 L. Ed. 1151, is considered as controlling. There it was said:

"The weight of authority seems to be that the consignee is prima facie liable for the payment of the freight charges when he accepts the goods from the carrier. * * * However this may be, in our view, the question must be decided upon consideration of the applicable provisions of the statutes of the United States regulating interstate commerce. The purpose of the act to regulate interstate commerce, frequently declared in the decisions of this court, was to provide one rate for all shipments of like character, and to make the only legal charge for the transportation of goods in interstate commerce the rate duly filed with the Commission. * * * It was therefore unlawful for the carrier, upon delivering the merchandise consigned to Fink, to depart from the tariff rates filed. The statute made it unlawful for the carrier to receive compensation less than the sum fixed by the tariff rates duly filed. Fink, as well as the carrier, must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by the tariff. When the carrier turned over the goods to Fink upon a mistaken understanding of the rate legally chargeable, both it and the consignee undoubtedly acted upon the belief that the charges collected were those authorized by law. Under such circumstances, consistently with the provisions of the Interstate Commerce Act, the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. * * * The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay. This may be in the present, as well as some other cases, a hardship upon the consignee, due to the fact that he paid all that was demanded when the freight was delivered; but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation."

It is argued in the instant case that the defendants should not be held liable for this undercharge, for the reason that they did not become the owners of the goods until their delivery at Gadsden; the agreement with the shippers being that the goods were to be delivered f. o. b. Gadsden, the defendants being under no obligation to pay the freight charges. This argument, however, we think, is answered in the following language from the Fink Case, supra:

"It is alleged that a different rule should be applied in this case, because Fink, by virtue of his agreement with the consignor, did not become the owner of the goods until after the same had been delivered to him. There is no proof that such agreement was known to the carrier, nor could that fact lessen the obligation of the consignee to pay the legal tariff rate when he accepted the goods."

In the Fink Case, the court cites with approval the case of Penn. R. Co. v. Titus, 216 N. Y. 17, 109 N. E. 857, L. R. A. 1916E, 1127, Ann. Cas. 1917C, 862, wherein, speaking of an interstate shipment under a bill of lading of similar import to that here under consideration, and to the question of the recovery of an undercharge of the consignee, that court said:

"The payment of the charges was made by the bill of lading, or by one of the terms of the shipment controlling the rights of the consignee, the condition of a delivery to the consignee. When he accepted the delivery under such bill of lading or provision, the law implied a promise on his part to pay the charges, such being the terms on which the peaches were to be delivered. In accepting and receiving the goods, he made himself a party to the contract between the consignor and the plaintiff, or entered into an original contract to pay, which took the place of the right of the plaintiff to retain the property until the charges were paid. * * * The one and only lawful and correct freight rate was that set forth in the schedule or tariff filed in the office of the Interstate Commerce Commission and duly published and posted. The United States statutes, known as the Interstate Commerce Act, made that rate arbitrary, immutable by the agreement, mistake or artifice of the parties, and not to be deviated from. The consignor, consignee, and carrier were alike charged with full knowledge of it and its inescapable force, and it was the rate which the defendant agreed to pay in accepting the goods."

The question of estoppel as against the railway company is disposed of in the Fink Case in the following language:

"Nor can the defendant in error successfully invoke the principle of estoppel against the right to collect the legal rate. Estoppel could not become the means of successfully avoiding the requirement of the act as to equal rates, in violation of the provisions of the statute."

In New York Cent., etc., Ry. v. York, etc., Co., 256 U. S. 406, 41 S. Ct. 509, 65 L. Ed. 1016, it appeared that the interstate shipment there in question was to the defendants as commission merchants under a straight bill of lading, none of which came into the consignee's possession, and the commission merchant had no knowledge of their issuance or their terms, but accepted the shipment and paid the charges claimed. The merchandise was sold, and the net proceeds remitted to the shipper. Discovering, later, that it had collected less than the lawful rate from the commission merchant, the railroad company demanded the balance alleged to be due by reason of such undercharge. The trial court held that, whether or not the commission merchant had impliedly agreed to pay the rates imposed by law was a question of fact, to be determined upon consideration of all the circumstances. The Supreme Court of the United States, however, holding to the contrary, said:

"We think the doctrine announced in Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U. S. 577, * * * is controlling, and that the liability of York & Whitney Company was a question of law. The transaction between the parties amounted to an assumption by the consignee to pay the only lawful rate it had the right to pay or the carrier the right to charge. The consignee could not escape the liability imposed by law through any contract with the carrier."

Many authorities upon this question are reviewed in the recent case of Western & Atl. R. Co. v. Underwood (D. C.) 281 F. 891, with appropriate quotations from the Interstate Commerce Act (U. S. Comp. St. § 8563 et seq.), and the Bills of Lading Act (U. S. Comp. St. §§ 8604aaa–8604w). There it was pointed out that the carrier has a lien for the freight charges, and that the statute requires delivery to the consignee or holder of an order bill only upon an offer in good faith to satisfy the carrier's lawful lien upon the goods. This fairly implies a duty placed on the consignee to satisfy the lien, if he takes the goods. No mistake as to the amount of freight can be asserted, and no misrepresentations about that can deceive, for the consignee is bound to know what it is. Such was the conclusion of the court in the Underwood Case, as drawn from a consideration of the decisions of the Supreme Court of the United States in Pittsburgh, etc., Ry. v. Fink and New York Central v. York, etc., Co., supra. See, also, L. & N. R. Co. v. Central Iron & Coal Co. (C. C. A.) 284 F. 250; Waters v. Pfister & Vogel Leather Co., 176 Wis. 16, 186 N. W. 173. In this latter case, after reviewing the federal authorities above cited, the Supreme Court of Wisconsin, in discussing the liability of the consignee for the lawful freight rate, and the reasoning upon which this liability rests, said:

"It is not the payment of a part of the amount due that makes the consignee liable. It is the acceptance of the goods. Having made himself liable by the acceptance of the goods, he cannot discharge his liability by the payment of any amount less than the lawful charge. * * * Having accepted the goods, and it being undisputed that only a part of the lawful charge has been paid, the defendant thereby became liable for the remainder."

The foregoing authorities recognize that individual hardships may be occasioned by the enforcement of this rule, but that instances of such individual hardship cannot be permitted to change the policy which Congress has embodied in the statute, in order to secure uniformity in transportation charges.

Counsel for appellee rely upon Central of Ga. v. Southern Concrete, etc., Co., 193 Ala. 108, 68 So. 981, Ann. Cas. 1916E, 376. At the time of the decision in that case, the question here involved had not been fully developed by the federal authorities by which this court is bound. It very evidently escaped the attention of the court in Western Ry. Co. v. Collins, supra, as no reference was made thereto in the opinion; but we are persuaded that the effect of the decision in the Collins Case was to overrule Central of Ga. v. Southern Concrete Co., supra, and we therefore now expressly so declare.

As previously stated, what was said in the Collins Case is decisive of the instant case adversely to appellees' contention, and is fully supported by the federal authorities herein cited, and from which we have so liberally quoted.

When the defendants paid the tariff and received the duly indorsed bill of lading, they became in law the consignee and the owner of the goods shipped. They surrendered this bill of lading to the railroad company and accepted the shipment. The effect of the federal decisions above cited is that, under these circumstances, the defendants became liable for the full amount of the lawful freight rate, and are not relieved from this liability by virtue of any understanding with the shipper or any conduct on the part of the railway which might otherwise, in the absence of the Interstate Commerce Act, be invoked as an equitable estoppel.

It results therefore that, in our opinion, the plaintiff was entitled to recover for this undercharge. The judgment of the court below will be reversed, and one here rendered in favor of the plaintiff for the amount sued for.

Reversed and rendered.

All the Justices concur.